# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION (DAYTON)

| | | |
|---|---|---|
| STEVEN BENNETT<br>568 Louise Drive<br>Xenia, OH 45385 | ) ) ) ) | CASE NO.<br><br>JUDGE: |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| PORTS PETROLEUM COMPANY, INC.<br>1337 Blachleyville Road<br>PO Box 1046<br>Wooster, OH 44691 | ) ) ) ) ) ) | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**JURY DEMAND ENDORSED HEREIN** |
| **Serve Also:**<br>Ports Petroleum Company, Inc.<br>c/o Matthew D. Ports (Stat. Agent)<br>2824 Happy Valley Road<br>Wooster, OH 44691 | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

Plaintiff STEVEN BENNETT, by and through undersigned counsel, as his Complaint against the Defendant, states and avers the following:

## PARTIES

1. Bennett is a resident of the city of Xenia, Greene County, state of Ohio.

2. Defendant PORTS PETROLEUM COMPANY, INC., ("Ports Petroleum") is a domestic-incorporated, for profit company that conducts business throughout the state. The relevant location of the events and omissions of this Complaint took place was 404 N Urbana Street, South Vienna, Ohio 45369, and at other Ports Petroleum locations.

3. Ports Petroleum is, and was at all times hereinafter mentioned, Bennett's employer within the meaning of the Family and Medical Leave Act ("FMLA") 29 U.S.C. § 2617 *et seq.*, and R.C. § 4112.01 *et seq*.

## JURISDICTION & VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Bennet is alleging a federal law claim under FMLA.

5. This Court has supplemental jurisdiction over Bennett's state law claims pursuant to 28 U.S.C. § 1367, as they are so closely related to his federal law claims that they form part of the same case of controversy under Article III of the United States Constitution.

6. Venue is proper in this Court pursuant to 28 U.S.C § 1391(b)(1) and/or (2).

## FACTS

7. Bennett is a former employee of Ports Petroleum.

8. At all times noted herein, Bennett was qualified for his position with Ports Petroleum.

9. At all times noted herein, Bennett could fully perform the essential functions of his job, with or without a reasonable accommodation.

10. Bennett worked for Ports Petroleum as a Retail Area Supervisor from October 16, 2017 until Ports Petroleum wrongfully terminated Bennett's employment on or about September 19, 2020.

11. At the beginning, Bennett's employment with Ports Petroleum was positive with no disciplinary incidents against him.

12. Bennett's job duties required him to travel to various stores as needed.

13. In or around March 2020, the COVID-19 pandemic swept across the United States, causing many states, including Ohio, to declare Stay-At-Home Orders.

14. Up until late August 2020, Bennett never missed any substantial amount of work.

15. On or around August 27, 2020, Bennet called the Director of Operations, Hayley Ahrendt, to say he was not feeling well, that he believed he was experiencing COVID-19 symptoms, and that he was going to the hospital to get a COVID-19 test.

16. At the hospital, Bennett tested positive for COVID-19 and was instructed to quarantine.

17. Bennett called Ahrendt to tell him that he tested positive for COVID-19.

18. Ahrendt told Bennett to complete the quarantine, that he would let others who may have come in contact with Bennett know that they should quarantine too, and reassured Bennett that he would be paid during his quarantine.

19. During his quarantine, Bennett continued to work from home when he could and began receiving FMLA leave for his time out.

20. On or around September 7, 2020, Bennett called an ambulance and was rushed to the Solon Medical Center because he could not breath.

21. Doctors at Solon Medical Center said that Bennett developed double pneumonia and placed him in the COVID-19 intensive care unit ("ICU").

22. Bennett communicated with Ahrendt and Joel Teague, Vice President of Retail, throughout the whole process.

23. When Bennett was discharged from the hospital on or around September 11, 2020, he called Ahrendt to say that he may be able to return to work on or around September 14, 2020, if his doctor permitted him to do so.

24. When Bennett asked his doctor if he could return to work, his doctor said that he needed to wait an additional two weeks and get a negative COVID-19 test before he would be comfortable sending Bennett back to work.

25. Bennett called Ahrendt to explain that he would need to wait until at least September 21, 2020 to return.

26. Ahrendt seemed frustrated by Bennett's call, and alluded that he thought Bennett was lying about his inability to return and was just trying to get extra time off work.

27. On or around September 18, 2020, Bennett's work phone was not working so he called Ahrendt to ask what was going on.

28. Ahrendt told Bennett that the server was down, but Bennett suspected this was not true.

29. Bennett called another store manager, Misty Norway, to ask about the server.

30. Norway responded that the server was fine, and further explained that Ahrendt had recently called her and asked if she saw Bennett at the store when he was first feeling his COVID-19 symptoms.

31. Norway continued saying that she felt pressured by Ahrendt to say that she had seen Bennett at the store while he was symptomatic. Bennett had not.

32. On or around September 19, 2020, Bennett was released to return to work and called Ahrendt to let him know.

33. Ahrendt told Bennett to meet him at the South Vienna store so that he could bring Bennett back up to speed.

34. When Bennett arrived at the South Vienna store, Ahrendt seemed standoffish and told Bennett that they were waiting on Teague to join them for a meeting.

35. When Teague arrived, the three went into the store office where Teague asked Bennett how he was feeling.

36. Bennett replied that he was feeling better but still tired.

37. During the meeting, Bennet was told that his employment was being terminated for introducing COVID-19 to the stores.

38. Bennett rebutted this rationale because he did not know he was sick at the time, and when he began feeling symptoms, he immediately sought a COVID-19 test instead of coming to work.

39. Teague revealed that he had employee reports saying that Bennett was coming to work while symptomatic. This was not true.

40. Ports Petroleum subsequently terminated Bennett's employment.

41. Ports Petroleum's termination of Bennett's employment was an adverse employment action against him.

42. Ports Petroleum's purported reason(s) for Bennett's employment termination was pretextual.

43. Ports Petroleum actually terminated Bennett's employment discriminatorily, in retaliation for using FMLA leave, against Bennett's actual or perceived disability, and/or in violation of public policy, specifically COVID-19 related policy.

44. As a result of the above, Bennett has suffered and continues to suffer damages.

## COUNT I: FMLA RETALIATION

45. Bennett restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

46. Pursuant to 29 U.S.C. § 260 *et seq.*, covered employers are required to provide employees job-protected, paid leave for qualified medical and family situations.

47. Ports Petroleum is a covered employer under FMLA.

48. During his employment, Bennett qualified for FMLA leave.

49. During his employment, Bennett used FMLA leave while at the hospital receiving treatment for and recovering from COVID-19.

50. During Bennett's FMLA use, he continued to work for Defendant remotely.

51. On or around September 11, 2020, Bennett's doctor informed him that he would not be approved to return to work unless he continued to quarantine for another two weeks and tested negative for COVID-19 at the conclusion of those two weeks.

52. When Bennett told this to Ahrendt, Ahrendt seemed frustrated, complaining that he did not believe Bennett was telling the truth and was just trying to get extra days off work.

53. On or around September 18, 2020, Bennett's phone was not working properly and Ahrendt told Bennett that the server was down, thus making his job more difficult to perform remotely.

54. After testing negative and returning to work on or around September 19, 2020, Bennett was immediately terminated for introducing COVID-19 into the stores.

55. Bennett had not introduced COVID-19 to the stores.

56. Ports Petroleum's purported reason for terminating Bennett's employment was pretextual.

57. The temporal proximity between Bennett's communication with Ahrendt about the extended quarantine instructions from his doctor, Ahrendts's frustrated comments and lies, and Bennett's termination suggest that Bennett was terminated for using FMLA leave.

58. As a direct and proximate result of Ports Petroleum's acts and omissions, Bennett has suffered and will continue to suffer damages.

**COUNT II: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112.01 *et seq.***

59. Bennett restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

60. Bennett's experience at Ports Petroleum was generally positive for the first two years of his employment; however, he began receiving disparate treatment after testing positive for COVID-19.

61. Ports Petroleum was aware that Bennett tested positive for COVID-19 on or around August 27, 2020.

62. After closely following his doctor's orders and COVID-19 protocol, Bennett returned to work only to face an immediate termination.

63. Pursuant to O.R.C. § 4112.01 *et seq.*, it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's disability or perceived disability.

64. The temporal proximity between Bennett's positive COVID-19 test and subsequent disparate treatment by Ports Petroleum implies that Ports Petroleum terminated Bennett's employment because he is disabled due to this COVID-19 diagnosis.

65. Alternatively, the temporal proximity between Bennett's positive COVID-19 test and subsequent disparate treatment by Ports Petroleum implies that Ports Petroleum terminated Bennett's employment because it perceived him as disabled due to this COVID-19 diagnosis.

66. As a direct and proximate result of Port Petroleum's acts and omissions, Bennett has suffered and will continue to suffer damages.

### COUNT III: FAILURE TO ACCOMMODATE

67. Bennett restates each and every prior paragraph of this complaint, as if it were fully restated herein.

68. Bennett informed Ports Petroleum of his positive COVID-19 test on or around August 27, 2020 by and through Ahrendt.

69. Bennett requested accommodations from Ports Petroleum to assist with his disabling condition, namely FMLA leave.

70. The requested accommodation was available to Bennett, would have been effective, would not have posed an undue hardship on Ports Petroleum, and was reasonable.

71. FMLA leave provides employees job-protected leave for qualified medical and family situations.

72. When Bennet attempted to return to work, his employment was immediately terminated.

73. Ports Petroleum therefore failed to provide Bennett with an accommodation by retaliating against his use of FMLA.

74. Ports Petroleum violation O.R.C. § 4112.02 by failing to provide Bennett a reasonable accommodation.

75. As a direct and proximate result of Ports Petroleum's acts and omissions, Bennett has suffered and will continue to suffer damages.

**COUNT IV: UNLAWFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

76. Bennett restates each and every prior paragraph of this complaint, as if it were fully restated herein.

77. A clear public policy exists and is manifested in Ohio's Stay-At-Home Order mandated by Governor Mike DeWine on or around March 23, 2020.

78. As of August 27, 2020, Ohio's Stay-At-Home Order was still instructing Ohio employers to actively encourage employees to stay home if they have COVID-19 symptoms and to

ensure their sick leave policies were up to date, *flexible, and non-punitive* to allow sick employees to stay home to care for themselves.

79. As set forth above, Bennett gave Ports Petroleum, by and through Ahrendt, notice on all his symptoms and doctor's orders, including the extension of his quarantine and negative COVID-19 test required to return to work.

80. Ports Petroleum's termination of Bennett's employment jeopardizes this public policy.

81. Ports Petroleum's termination of Bennett's employment was motivated by Bennett's conduct related to these public policies.

82. Ports Petroleum had no overriding business justification for terminating Bennett's employment.

83. As a result of Ports Petroleum's acts and omissions, Bennett has suffered and will continue to suffer damages.

**DEMAND FOR RELIEF**

WHEREFORE, Bennett demands from Ports Petroleum the following:

a) Issue a permanent injunction:

   i. Requiring Ports Petroleum to abolish discrimination, harassment, and retaliation;

   ii. Requiring allocation of significant funding and trained staff to implement all changes within two years;

   iii. Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

    iv.    Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

    v.    Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Ports Petroleum to expunge Bennet's personnel file of all negative documentation;

c) An award against each Defendant for compensatory and monetary damages to compensate Bennett for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against each Defendant in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for Bennett's claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ Matthew Bruce
Matthew G. Bruce (0083769)
     Trial Attorney
Evan R. McFarland (0096953)
**THE SPITZ LAW FIRM**
11260 Chester Road, Suite 825
Cincinnati, Ohio 45246
Phone: (216) 291-0244 x173
Fax:    (216) 291-5744
Email: Matthew.Bruce@SpitzLawFirm.com
Email: Evan.McFarland@SpitzLawFirm.com

Attorneys for Plaintiff Steven Bennett

## JURY DEMAND

Plaintiff STEVEN BENNETT demands a trial by jury by the maximum number of jurors permitted.

/s/ Matthew Bruce
Matthew G. Bruce (0083769)

11